## In re ELDRIDGE BREWING CO., Inc.
### No. 4425.

District Court, D. New Hampshire.
March 13, 1939.

M. Broderick, of Manchester, N. H., and Frank Sulloway (of Demond, Sulloway, Piper & Jones), of Concord, N. H., for creditors.

Robert Upton and Laurence Duncan, both of Concord, N. H., for debtor.

MORRIS, District Judge.

On June 3, 1938, the Eldridge Brewing Company, Inc., a corporation organized under the laws of the State of Maine and having its place of business at Portsmouth, County of Rockingham, State of New Hampshire, filed a petition in this court under the provisions of Section 77B of the Bankruptcy Act of July 1, 1898, and acts amendatory thereof and supplementary thereto, 11 U.S.C.A. § 207, seeking a reorganization. The schedules filed show liabilities to unsecured creditors of approximately $125,000.

A hearing on said petition was held on June 6, 1938, at which time the petition was approved as properly filed and the Debtor continued in possession. Three appraisers were appointed by the Court who returned an appraisal of the property on the basis of a going concern.

On July 1, 1938, a hearing was held in accordance with the order of June 6th confirming the order of that date and continuing the cause to August 2nd. At this hearing an order was made requiring claims of stockholders and creditors to be filed on or before August 23rd. Numerous hearings were held thereafter and on November 3rd a plan of reorganization was filed.

This plan provided for settlement in full of the unsecured claims by issue of notes of the debtor in the amount of 40 per cent, 35 per cent preferred stock and 25 per cent of common stock.

On November 22nd a meeting of the unsecured creditors was held in Boston at which $106,000 worth of claims was represented. A creditors' committee consisting of six persons, two of whom were attorneys was appointed to report at an ad-

journed meeting on November 28th. This committee was formed for the purpose of considering the proposed plan, investigating the assets of the debtor and such other facts as were deemed essential.

At the meeting on the 28th there was a very full attendance of the creditors and their representatives. This committee made a report recommending that serial notes in the amount of 100 per cent of the claims of unsecured creditors be issued in place of the notes, and preferred and common stock provided in the plan then before the committee. Only one change was made in the report of the committee and that related to the due date of the notes proposed to be issued. With this change the report was unanimously adopted. The recommendations were taken up with the Debtor and its counsel and a new draft plan was made and submitted to creditors and stockholders for their acceptance or rejection. But before the plan was completed certain of the creditors suggested that the notes to be issued should be secured by a mortgage. No mention was made of a mortgage in the report of the committee, which, as above stated, was unanimously adopted.

The Debtor conceded the point raised regarding a mortgage and an amended plan containing mortgage provisions was filed December 13, 1938. The mortgage provisions were as follows: "Each unsecured creditor whose claim exceeds $100 shall receive in full satisfaction and discharge of such claim a note or notes of the debtor secured by a trust indenture or mortgage of the lands and buildings of the debtor situate in Portsmouth, in said District, and the machinery annexed and affixed thereto, subject to existing liens and mortgages."

The order of notice provided that acceptances and rejections be filed on or before January 5, 1939.

A hearing was held on January 13 in accordance with the order entered December 13 and this hearing was continued to February 3, 1939.

The debtor filed its motion for confirmation of the plan January 3, 1939. Upon notice to creditors a hearing on the question of confirmation was held February 3, and at this hearing it was reported that more than seventy-five per cent of the creditors and all of the stockholders of the debtor company had accepted the plan. Eugene J. Meyer, treasurer of the George J. Meyer Malt & Grain Company asked

leave orally to withdraw the company's acceptance. After hearing counsel generally on the terms of the plan a further hearing was continued to February 10. At the hearing on February 10, the further question of confirmation was discussed and George J, Meyer Malt & Grain Company and Hales and Hunter Co. filed a petition for leave to withdraw their assents. It was ordered that the debtor file an answer to the petition to withdraw on or before February 14 and that a hearing thereon be held February 21. Further hearing on confirmation of the plan was continued to that date.

■ The petition of the above named creditors alleged as grounds for withdrawal that: "The petitioners object to the form of the mortgage proposed by the debtor in conjunction with the proposed plan because it fails to give the creditors that degree of control over the debtor's business which the Chandler Act vests in them."

The answer to the above objection is that the action was filed June 3, 1938, more than three months prior to the effective date of the Chandler Act and is controlled by the provisions of 77B of the Bankruptcy Act passed by Congress June 7, 1934.

■ The second objection is that: "The proposed mortgage is subject to a prior mortgage lien covering all the assets of the debtor corporation and provides for foreclosure upon a vote of twenty per cent of the note holders."

This refers to the second mortgage, the first mortgage being a mortgage securing about $14,000 covering real estate only. The second mortgage secures the payment of $68,500 and covers all real estate and personal property.

The petitioners had knowledge of the existence of these mortgages prior to the filing of their acceptances. This they admit in their petition. If they did not know what the second mortgage covered before filing their acceptances they are at fault for not knowing because the information was readily available even without an examination of the records. Counsel for the debtor would have supplied the information at any time upon request.

They now take the position that the second mortgage so far as it relates to personal property is invalid because the form of oath attached to the mortgage was not modified to truly express the conditions of the mortgage notes.

922

The Eldridge Brewing Company purchased from the Portsmouth Company the Frank Jones property in 1936 and after a lean year on account of diminished sales it found itself short of working capital and by vote of the corporation authorizing it to borrow $100,000 on mortgage notes payable to Charles H. Batchelder trustee, $68,500 of these notes were issued, secured by the above mentioned mortgage. The balance of the authorized amount has never been issued.

The second mortgage is dated October 1, 1937. Whether or not this mortgage is invalid because of its defective oath is a question that is not now before me for determination.

The petition alleges that the Jones Brewery was purchased by the debtor on December 2, 1936, from the Portsmouth Company, the debtor's wholly owned subsidiary in Boston and that little, if any, cash should have been paid for the transfer.

Petitioners confuse the Portsmouth Company, from whom the purchase was made, with the Portsmouth Company of Boston which is a subsidiary of the Eldridge Brewing Company. The two Portsmouth companies are entirely distinct entities and have no relation to each other.

At the hearing on the petition it was claimed that the notes issued under the second mortgage were issued for prior existing indebtedness and not for cash and are, therefore, a fraud upon the present unsecured creditors.

I find that they were all issued for cash and in one instance only was a note issued for $1000 which could be said to be a prior existing indebtedness and this was a cash transaction wherein a customer had advanced to the debtor a sum of money as pre-payment for goods to be shipped. All cash received on the notes is reflected in the books of the corporation.

I find that the petitioners have not established the allegations in their petition and that to allow them to withdraw simply because they insist that the third mortgage should be made to cover the personal property of the debtor does not establish a sufficient reason for granting the petition and thus defeat the confirmation of the plan. This is particularly true because when their acceptances were filed the plan provided in plain language that the mortgage notes should be secured on "all of the debtor's real estate and machinery attached there-

to," and were subject to all prior existing liens. See: Continental Insurance Company v. Louisiana Oil Corporation, 5 Cir., 89 F.2d 333.

At a continued hearing on the question of confirmation of the plan held March 1, nine creditors who had proved their claims appeared by counsel and objected thereto. The aggregate of their claims amount to $12,276.13.

The objections of the minority group of creditors is substantially the same as the reasons given in the petition for withdrawal.

They argue that the third mortgage, insofar as it relates to personal property, should be made co-extensive with the second mortgage, that is, that it should cover the same property rights.

They further argue that the plan is unfair because twenty per cent of the note holders under the second mortgage may procure action on the part of the trustee to foreclose, while under the provisions of the proposed third mortgage fifty-one per cent of the note holders are required.

The main items of personal property upon which further security is desired consists of barrels, bottles, crates, hops, ale in process of manufacture, trucks, office furniture and good will. Everything except the last two items is personal property of a shifting character, and necessarily so, in the operation of the plant.

The further argument was presented that no plan should be confirmed until the validity of the second mortgage with reference to personal property was determined.

Under the terms of the plan, payment of the second mortgage note holders is postponed to a date beyond the liquidation of the third mortgage note holders. To make the changes proposed by the minority creditors would involve the drafting and submission of a new plan. This would cause delay, extra expense and a continuation of operations under the supervision of the Court, and while, up to the present time, the operations of the debtor have shown some improvement and increase in its working capital it does not signify future success as operations of a business under Court orders involves large expenditures and hinders expansion.

The debtor company requires a very considerable amount of money to continue its operations as during some months the taxes payable to the Federal government

approximate from $15,000 to $20,000. **Up** to the present time it has not been necessary to issue receiver's certificates.

Considering the testimony from all angles I find nothing in it except an effort on the part of objecting creditors to grab off more security, tie the company up more closely and obtain something that was not contemplated in the creditors' committee report and not incorporated in the plan which more than 75 per cent of the unsecured creditors and a majority of the stockholders accepted.

None of the objecting creditors, not even those who desired to withdraw their acceptances, wish to have the company liquidated and so stated in open court.

Any confirmation of the plan must contain an injunctive order prohibiting the debtor from issuing any additional notes under the second mortgage.

With this limitation I hold that the plan and accompanying mortgage should be confirmed and a decree may be presented to that effect.